GEORGE M. HARDEN v. CHESAPEAKE AND OHIO RAILROAD COMPANY AND SOUTHERN RAILWAY COMPANY.

(Filed 22 November, 1911.)

1. **Carriers of Goods—Live-stock Bill of Lading—Negligence—Insurer—Exceptions.**

A railroad company's liability for negligent injury to stock shipped under its usual live-stock bill of lading is that of a common carrier, with the exception that it is not held as an insurer against injuries arising from the natural or proper vices or the inherent nature and propensities of the animals themselves, unless the injuries from such sources are attributable, in whole or in part, to the carrier's negligence.

2. **Same—Duty of Carriers—Cars.**

Carriers in the proper performance of their duties are required to provide suitable and adequate cars for the care and preservation of live stock during their carriage, or to afford proper facilities for having them watered and attended to, and to make proper provision for them in reference to peculiar traits or conditions of which they have notice, especially when the carrier makes stipulations in reference to such conditions.

3. **Same—Evidence.**

A common carrier received a shipment of valuable horses, issuing therefor its usual live-stock bill of lading, confining recovery, in event of injury, to the inadequate maximum sum of

HARDEN *v.* R. R.

$100 each, at the same time being informed of the character of the horses, and that there was a stallion among them which would injure the other animals if allowed to mingle with them; and in consequence undertook to box off the stallion to itself in the car with the others. There was evidence tending to show that the boxing-off of the stallion was a "sorry job," and being required by a connecting line of carriers to make it more secure, did so, but by mistake placed another horse therein, and put the stallion in with the other horses in the car, resulting in their injury: *Held,* evidence sufficient of the actionable negligence of the initial carrier, and the stipulation in the bill of lading restricting the amount of the recovery is therefore void.

**4. Same—Arbitrary Value—Inadequacy—Public Policy.**

In order to sustain a provision in a railroad company's live-stock bill of lading limiting the amount of recovery to a certain sum per head, it must appear that there was an intent and *bona fide* effort on the part of the carrier and consignor to fix upon the value of the shipment, and it will not meet the requirement when the carrier has notice that the shipment contemplated was of high-priced horses, that the stipulated amount of recovery was grossly inadequate, and that the agent wrote in the stipulated valuation in an old form of bill of lading after asking the consignor if he should do so in order to give him a lower rate of freight.

**5. Same—Contract Against Negligence—Waiver.**

A stipulation in a carrier's live-stock bill of lading which arbitrarily fixes a maximum valuation of the stock shipped and recoverable thereunder, without examination of the stock or any *bona fide* effort to arrive at their true value, is, to the extent that it is inadequate, a contract against the consequence of the negligent acts of the carrier, and invalid; and the acts of the consignor in making the shipment under a bill of lading of this character will not be construed as a waiver of the effect of the negligent acts of the carrier inflicting injury to the stock.

**6. Carriers of Goods—Public Policy—Contract Against Negligence —Interstate Commerce Commission.**

A ruling of the Interstate Commerce Commission designed and intended simply as a regulation establishing a reasonable and proper freight rate for the shipment of live stock, without more, cannot affect the principle prevailing in this State, that the provision in a live-stock bill of lading which arbitrarily fixes the maximum amount recoverable is void as a contract on the carrier's part against its own negligence.

**7. Carriers of Goods—Live-stock Bills of Lading—Void Stipulations —Lex Loci Contractus—Presumptions.**

The decisions in this State declaring void, under certain conditions, a stipulation in the live-stock bill of lading of a railroad as a contract against recovery for its negligent acts, are based upon the principles and policy of the common law, and where the contract of carriage is made in another State, these same principles are presumed as to the law of such other State, in the absence of evidence to the contrary.

APPEAL from *Whedbee, J.,* at the April Term, 1911, of WAKE.

Civil action to recover for damages to live stock, shipped by plaintiffs over the lines of defendant companies.

On the trial, it appeared that plaintiffs, having purchased a number of standard-bred horses, in February, 1910, shipped same over lines of defendant companies from Lexington, Ky., over C. and O. road, to Lynchburg, Va., and from that point over the Southern to Greensboro, N. C. There was evidence, on the part of plaintiff, tending to show that plaintiffs, during the negotiations for shipment, informed the agent of the C. and O. road that the horses were a high-priced lot and that one was a stallion, about three years old; that the natural propensities of a stallion, of that age, and of this one, were such that it was dangerous to turn him in with the other stock, and that defendant, the C. and O. road, on being informed that such an animal was in the lot, undertook and agreed to have him securely boxed off from the others; that this was done in such a negligent manner that, when the car reached Lynchburg, this partition or stall was entirely down, allowing all the stock to mingle together. The agent of the C. and O., describing the manner in which it had been first constructed, spoke of it as a "sorry job," and, owing to this fact and the condition of the car, the Southern Railway refused to receive the stock, at Lynchburg, until the car was repaired and the conditions corrected; that this was done by the agent of the C. and O. and the stall securely built, but, in replacing the horses in the car, said agent put in the box stall one of them which had already been hurt and turned the stallion in with the others, and with the result that, when the stock arrived at Greensboro, they were bitten and kicked until one of them died of his injuries and others badly damaged,

to the amount of $1,160; that of this damage $450 was done to the horses of another shipper, and the damage done to plaintiff's horses, attributable to defendant's negligence, amounted to $710.

There was allegation, with evidence, on part of defendant, tending to show that defendant, the C. and O. Railroad, had only made a rate as far as Lynchburg, the shipment from that point being over the lines of the Southern Railway; that the defendant, the C. and O. Railroad, had not undertaken to box off the stallion and was guilty of no negligence in that respect. Defendant further introduced and relied upon the written contract of shipment or bill of lading, in which it was stipulated, in effect, and as relevant to the inquiry, that, in consideration of a reduced freight rate, the C. and O. Railroad was only to be chargeable for injuries arising from its *gross* negligence, and, on the question of value, that in cases of any injuries to the stock, for which said company was responsible under the contract, the amount of recovery should, in no case, exceed $75 for each horse, mule, stallion, or jack; $30 for each cow, steer, or bull, and $5 for each other animal; and the agent testified that this was an old printed form, and the value, $75, having been changed to $100 by subsequent regulations of the company, he inserted the $100 in lieu of the $75, and that, by this classification and rating, the plaintiffs saved several hundred dollars in freight charges. There was testimony, also, for defendant, that the classification and freight rate, in this instance, was in accord with a regulation made and approved by the Interstate Commerce Commission.

The judge charged the jury and, on issues submitted, they rendered the following verdict:

1. Was the plaintiff's property injured by the negligence of the defendant, the Southern Railway Company, as alleged in the complaint? Answer: No.

2. Was the plaintiff's property injured by the negligence of the defendant, the Chesapeake and Ohio Railway Company, as alleged in the complaint? Answer: Yes.

3. What damages is plaintiff entitled to recover from the Southern Railway Company? Answer: None.

157—16

4. What damages is plaintiff entitled to recover from the Chesapeake and Ohio Railway Company? Answer: $710.

Judgment on verdict for plaintiff, and defendant C. and O. Railroad excepted and appealed.

*Armistead Jones & Son for plaintiff.*
*Aycock & Winston for defendant.*

HOKE, J., after stating the case: It is very generally held that railroad companies, receiving live stock for shipment, take and hold them as common carriers, and, as a rule, are chargeable with the duties of such carriers concerning them. There is a recognized limitation on the obligations of common carriers, in reference to live stock, to the effect that they are not considered as insurers of such property against injuries arising from the natural or proper vices or the inherent nature and propensities of the animals themselves, or from the "vitality of the freight," as it is sometimes expressed, unless the injuries from such source are attributable, in whole or in part, to the carrier's negligence. The general principle, with its recognized modifications, is very well stated in Moore on Carriers, p. 486, as follows: "Carriers of live stock are common carriers, subject to all the duties, responsibilities, and liabilities, and entitled to all the rights and privileges, of a common carrier of merchandise or other inanimate property, save in one important respect. While common carriers are insurers of inanimate property against all loss and damage except such as is inevitable or attributable to the act of God, or caused by public enemies, and except that they are not held liable for losses which result from the inherent and intrinsic qualities of the goods carried by them, as carriers of live stock, they are not insurers of animals against injuries arising from or attributable to the natural or proper vices, or the inherent nature, propensities, and habits of the animals themselves, and which could not be prevented by foresight, vigilance, and care." And in Hale on Bailments and Carriers it is said: "Carriers of live stock are common carriers wherever carriers of other goods would be, but they are not liable, in the absence of negligence, for such injuries as occur in consequence of the vitality of the freight"; and these

statements will be found to accord with the great weight of authority. *Selby v. R. R.,* 113 N. C., 592; *Covington Stock Goods v. Keith,* 139 U. S., p. 128; *McCune v. R. R.,* 52 Iowa, 600; *Clark v. R. R.,* 14 N. Y., 570; Elliott on Railroads, sec. 1548; Hutchinson on Carriers (3d Ed.), sec. 339. Accordingly, carriers in the proper performance of their duties are required to provide suitable and adequate cars for the care and preserva-· tion of live stock during their carriage and to afford proper facilities for having them watered and attended to and to make proper provision for them in reference to peculiar traits or conditions of which they have notice, and especially ,when the carrier makes stipulations in reference to such conditions. *Kinnick Bros. v. R. R.,* 69 Iowa, 665; *Haynes v. R. R.,* Mo. App., 582; *Sturgeon v. R. R.,* 65 Mo., 596; *Indianapolis and ·C. R. R. v. Allen,* 31 Ind., 394; *Smith v. New Haven R. R.,* 12 Allen, 531; *Shaw v. Southern R. R.,* L. R. I., vol. VIII, p. 10 (1881-82); Hutchinson on Carriers (3d Ed.), secs. 342, 343 and 636; Moore on Carriers, p. 498, sec. 3.

There was ample evidence on part of plaintiffs tending to establish a breach of duty on the part of the C. and O. Railroad Company and justifying the verdict that the stock was injured by the negligence of said company. The agent of that road, testifying for defendant, in reference to the original construction of the stall, said it was "a sorry job," and when he had caused it to be rebuilt at Lynchburg, he put the wrong horse into it and turned the stallion in with the other horses. This being true, it is well established with us that "a common carrier in its contract of shipment cannot stipulate against recovery for loss or damage occasioned by its own negligence, and it can make no such stipulation against total or partial loss. *Stringfield v. R. R.,* 152 N. C., 128; citing *McConnell v. R. R.,* 144 N. C., 90; *Everett v. R. R.,* 138 N. C., 71; *Capehart v. R. R.,* 81 N. C., 438; *Parker v. R. R.,* 133 N. C., 335; *Caldison v. Steamship Co.,* 170 U. S., 272; *Railway v. Solan,* 169 U. S., 135; *Railway v. Lockwood,* 84 U. S., 357; *Nuneton v. Railway,* 31 Minn., 85, and numerous other decisions.

There are cases which hold that the act of defendant, in turning the stallion in with the other stock, would be an act of gross

negligence and so expressly within the terms of the agreement; but, without reference to this aspect of the evidence, under the doctrine as it prevails in this jurisdiction, this stipulation is entirely void as against public policy, or in any event can only operate to relieve them from liability as insurers, which is perhaps the correct interpretation of the words. And on the facts in evidence this same principle, which avoids stipulations against recovery for negligence on the part of the carrier, should obtain in reference to the clause in the bill of lading restricting the amount where the recovery is had on that ground. Speaking to this question in *Everett's case,* the Court said: "It would be an idle thing for the courts to declare the principle that contracts for total exemption from loss arising from a carrier's negligence a subversion of public policy and void, and at the same time uphold a partial limitation which could arise to prevent anything like adequate or substantial recovery by the shipper."

In the present case it appears that this was a high-priced lot of horses, and the agent of the initial carrier was informed of this fact; that the value was inserted by the agent in a printed formula according to a predetermined, inadequate valuation, and that there was no intent or effort to fix upon the true value of the shipment or to approximate it under any conditions sanctioned or permitted by the law; and it further appears by the uncontradicted testimony that the fair average value of the stock was between two or three hundred dollars per head. In *Stringfield's case, supra,* on facts very similar, the Court held that a restrictive stipulation of this kind as to recoveries for negligence on the part of carriers was in contravention of public policy and void. The ruling in *Stringfield's case* and others of like purport was not made to depend upon whether there was one or more horses in the shipment—a view presented on the argument here—but on the position that there had been no *bona fide* effort to arrive at the true value of the shipment or to approximate it, and to allow an arbitrary, predetermined valuation to stand far below the actual value would in actions of that character be in effect to uphold a stipulation against recovery for negligence—a stipulation, as stated, forbidden by

our law. In *Stringfield's case* attention was called to the fact
that the principle we are discussing, "when properly understood
and applied, did not prevent the parties from agreeing upon the
valuation of a given shipment which should form the basis of
adjustment in case of loss or damage, and where this was done
in the *bona fide* effort to fix upon the true value and was made
the basis of a fair and reasonable shipping rate, the parties
would be held to the agreed valuation, though the loss should
occur by reason of the carrier's negligence." And it was said,
too, that an agreed valuation might be in rare instances allowed
to stand for the purpose indicated, where it appeared that the
agent of the carrier being without knowledge or notice of the
true value of the property and without opportunity to inform
himself so as to make intelligent estimate concerning it, the
parties, in the *bona fide* effort to put a correct valuation upon it,
fix upon a fair average value of property of the kind consti-
tuting the proposed shipment and make the same, as stated,
the basis of a fair and reasonable shipping rate—an instance
afforded in the case of *Jones v. R. R.,* 148 N. C., 581. Such an
agreement and a valuation so established may not be allowed to
prevail simply because the minds of the parties have met and
agreed upon the amount, but in actions for injuries caused by
negligence of the carrier it must have been agreed upon in the
*bona fide* effort to fix upon a true valuation of the stock, and as
an aid to the correct solution it may at times be well to submit
an issue as to the true value or the average valuation of the prop-
erty of the kind constituting the shipment where such a view of
the question is permissible. There is no allegation or evidence
of any fraud or concealment as to value on the part of the
shipper, a principle sometimes present in such cases, nor can
the doctrine of estoppel be invoked for defendant's relief on the
facts presented in the testimony. The plaintiffs, on this ques-
tion, testified that they simply asked for the shipping rate, and
it was given them, without more. The agent of defendant testi-
fied that all that was said on the subject was that he asked if
the horses were to be shipped at the usual valuation, and on
being answered yes, he wrote that valuation in the bill of
lading. And further, as follows:

Q. Did he say anything about the value of the horses? A. No, I ·do not recall that he did. I asked him the question if they were to be shipped at that valuation, and he said yes.

Q. He did not say anything about the value himself? A. No.

Q. He did not suggest it to you? A. No.

Q. He did not read the contract; it was all done in· about two minutes? A. Yes; it would take a long time to read it.

Q. You did not read it to him? A. No.

Q. He said nothing as to the value of the horses? A. He only answered my question when I asked if they were to be shipped on the $100 valuation. He answered my question.

Speaking to this subject in *Stringfield's case,* the Court said: "Nor do we think that the doctrine of estoppel as applied in many of the cases relied upon should avail defendant here. Some of these decisions could be reconciled on the ground that if the disproportion between the actual and the stipulated values is so great as to give clear indication that there was no effort made to fix upon or approximate the true value, as in this case, it could be properly held that such a contract would be neither fair nor reasonable; but in many of them we think the doctrine of estoppel is too broadly stated. For if a contract like the one we are considering is such as to deny substantial recovery for loss occasioned by the carrier's negligence, it is void as against public policy, and it is not permissible to uphold such an agreement on the principle of estoppel. Such a position carried to its logical conclusion would enable individuals as to their personal contracts and conduct towards each other to set at naught both the public statutes and police regulations of the State. Accordingly, we find that except in cases of positive fraud, which in whole or in part may operate to set aside the contract relation, the doctrine of estoppel as ordinarily applied is only available in aid or extension of valid contracts. Bigelow on Estoppel (5th Ed.), citing *Brightman v. Hicks,* 108 Mass., 246; *Langorn v. Sankey,* 55 Iowa, 52; *Shurmen v. Eastin,* 47 Ark., 351; *Klink v. Kudbel,* 37 Ark., 304, authorities which fully support the text."

It was further insisted that the recovery should not be sustained because the classification and rate made in the bill of

lading had the sanction and approval of the Interstate Commerce Commission. We have not the ruling of the Commission before us, but in our opinion it cannot for a moment be sustained that a ruling of the commission designed and intended simply as a regulation establishing a reasonable and proper freight rate, without more, should have the effect of altering a principle of public policy long prevailing in the State, as said in *Everett's case, supra,* a principle established and adhered to for grave and weighty reasons and considered necessary for the protection of the great body of shippers. Replying to a suggestion somewhat similar, the Court in *Kissenger v. Fitzgerald,* 152 N. C., 252, said: "It is the settled policy of this State that common carriers may not contract against loss or damage occasioned by their negligence; and it has been held by the Supreme Court of the United States that, unless and until there is some valid regulation by Congress of the Interstate Commerce Commission directly affecting the matter, a State has the right to establish such a policy and enforce it in reference to interstate shipments. *Pa. Ry. v. Hughes,* 191 U. S., 477."

We are not inadvertent to the fact that the contract of shipment was made in Kentucky, and there is no evidence before us as to the rules prevailing in that State concerning it. The doctrine referred to, and which we hold to be controlling on the facts presented, was established and has come down to us from the principles and policy of the common law in reference to public carriers, and the same is presumed to obtain in a sister State in the absence of evidence to the contrary. *Roberts v. Pratt,* 152 N. C., 731. On investigation, however, it seems that like doctrine prevails in full force in the State of Kentucky and has been made a part of the organic law of that State. *Lewis v. Louisville and Nashville R. R.,* 135 Ky., 362.

On the whole matter, we find no reversible error in the record, and the judgment in plaintiff's favor is affirmed.

No error.

CLARK, C. J., concurring in the opinion of the Court: For reasons of the soundest public policy, it has always been settled law that a common carrier cannot contract for either total or

partial exemption from loss occasioned by its own negligence. The shipper and the common carrier are not on equal terms. The shipper must send his freight by the common carrier or not at all. He is therefore entirely at the mercy of the carrier unless protected by the higher power of the law against being forced into contracts limiting the carrier's liability.

In this case the evidence of negligence of the carrier is abundant and has been found by the jury. Therefore the carrier could not by any alleged contract relieve itself from liability for any part of the damages caused by its own negligence. The fact that it offered to carry the stock on the common-law basis of liability for its own negligence if the shipper would pay $650 extra, but would take off the $650, provided it was relieved against liability for its own negligence for all above $100 per animal, should not be seriously considered in the light of the decisions and of the "reason of the thing." In the language of the great dramatist (Henry VIII., Act 5, Sc. 3), the device is "too thin and bare to hide the offense."

The shipper was entitled to have his stock carried at the rate at which they were actually carried, which is evidently the current rate fixed by competition, and with the common-law liability on the carrier to pay the full extent of any damages caused by its own negligence. The carrier had no right to require $650 additional freight by way of insurance to shipper against its own negligence, since that is a liability which is assumed by the very nature of the contract of carriage.

A provision limiting liability to an agreed amount is invalid if the injury was caused by the carrier's negligence. *Everett v. R. R.,* 138 N. C., 71; *Capehart v. R. R.,* 81 N. C., 438; *Gardner v. R. R.,* 127 N. C., 293; *McConnell v. R. R.,* 144 N. C., 90. This has also been held in England, Alabama, California, Colorado, District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Mississippi, Missouri, New Jersey, Pennsylvania, Tennessee, and Texas. See cases collected 12 Ann. Cas., 1131-1134.

It is true that in *Hart v. R. R.,* 112 U. S., 331, that Court was led away by some means to disregard this principle which has been so long and so uniformly held and the maintenance of

which in its integrity is so necessary to the business interests of this country, which are largely dependent upon fair treatment by the great common carriers. To cure this departure of the Court, Congress passed what is known as the Hepburn Amendment to section 20 of the Interstate Commerce Act (U. S. Comp. Stat., Supp. 1907, p. 906), which provides that the initial carrier is liable for any loss, damage, or injury to the goods *caused* by it or any connecting carrier, and makes void any contract, receipt, rule, or regulation which attempts to exempt the carrier from this liability. 12 Ann. Cases, 1133, and cases cited.

In *R. R. v. Cranshaw*, 5 Ga. App., 675, it is held that the State courts have jurisdiction of an action arising under the Hepburn Act, and that any limitation of value or preadjustment of damages by a stipulation restricting the recovery of damages to an amount less than the actual loss caused by the carrier's negligence is void under this act. To same effect, *Latta v. R. R.* (U. S. C. C. A.), 172 Fed., 850. Under these decisions the doctrine laid down in *Hart v. R. R.*, 112 U. S., 331, is reversed by the Hepburn Act, which restores in its integrity the common-law rule that a common carrier cannot contract to be relieved in whole or in part from liability for damages caused by its negligence. The Pennsylvania Court, in *Grogan v. Express Co.*, 114 Pa., 523, 60 Am. Rep., 360, even prior to the Hepburn Act, refused to follow the decision in *Hart v. R. R.*, *supra*, and many other courts of repute did the same; and it may be said with some confidence that the best legal thought of the country sustained them. The effect of the *Hart case, supra*, if unreversed, would have been to place the business interests of the country in the power of the common carriers, for no shipper can contract on equal terms with them.

I agree with *Mr. Justice Allen* that *Jones v. R. R.*, 148 N. C., 580, and *Winslow v. R. R.*, 151 N. C., 250, should be overruled.

ALLEN, J., concurring: I think the authorities establish the following principles, which are based on a sound public policy and on reason:

(1) That a common carrier is an insurer, and, without proof of negligence, is liable for all injuries to goods being trans-

ported, unless the injury is caused by the act of God, the public enemy, the negligence of the shipper, or by the inherent qualities of the goods.

(2) That the natural propensities of live stock are included in the term "inherent qualities."

(3) That a private carrier for hire is not an insurer, but is a bailee, and is only liable for negligence.

(4) That the common carrier may limit its common-law liability as an insurer by contract which is reasonable and based on a valuable consideration, and when so limited it becomes a bailee for hire, and liable for negligence.

(5) That it cannot limit its liability for negligence.

The cases in our reports uniformly hold this doctrine, except *Winslow v. R. R.,* 151 N. C., 250, which follows *Jones v. R. R.,* 148 N. C., 580.

I do not think the *Jones case* was correctly decided, and believe it is wise to overrule it and the *Winslow case.* The learned judge who wrote the opinion in the *Jones case* cites, in support of the decision, four North Carolina cases: *Selby v. R. R.,* 113 N. C., 588; *Mitchell v. R. R.,* 124 N. C., 246; *Gardner v. R. R.,* 127 N. C., 293, and *Everett v. R. R.,* 138 N. C., 74, and quotes from the *Gardner case* as follows: "In the *Gardner case* the law is summarized as follows: 'A common carrier can make a valid agreement, fixing the value of shipments in case of loss by its negligence, if such agreement be reasonable or based upon a valuable consideration, and it must clearly appear that such was the intention of the parties.'"

I do not think these authorities sustain the decision.

In the *Selby case* the valuation clause in a bill of lading was not involved, and the only question raised was the reasonableness of a stipulation requiring the owner to give notice of injury to his stock before removal from possession of the carrier.

In the *Mitchell case* the bill of lading exempted the carrier from risks *"not arising from negligence,"* and the single question decided was whether, under such a bill of lading, the burden was on the plaintiff to prove negligence, or that a presumption of negligence arose from proof of injury while in possession of the carrier.

In the *Gardner* and *Everett cases* it was expressly held that the valuation clauses in those cases were not valid, and the owners were allowed to recover the amount of their losses.

The quotation from the *Gardner case* was taken from a headnote, and is not, I think, supported by the opinion.

It is said in that case: "It is a well-settled rule of law, practically of universal acceptance, that for reasons of public policy a common carrier is not permitted, even by express stipulation, to exempt itself from loss occasioned by its negligence."

In the *Everett case* this is quoted with approval, as is the following from Hutchison on Carriers: "A majority of the authorities in the United States hold that it is contrary to public policy to permit the carrier to stipulate for exemption from the effects of the negligence of himself or his servants, and it is also held by a majority of the courts that a contract limiting the liability of the carrier to a certain sum in case of loss, that is, contracts designed to secure a partial exemption from liability, while valid and conclusive where the loss is occasioned by something other than the carrier's negligence, cannot be allowed where the loss was occasioned by the negligence of himself or his servant, but that in such case the owner may recover the full value of the goods."

I do not think *Judge Ashe* has been excelled for accuracy and clearness by any judge who has been a member of this Court, and in *Capeheart v. R. R.,* 81 N. C., 443, speaking of the effect of stipulations in bills of lading limiting liability, he says: "Public policy demands that the right of the owner to absolute security against the negligence of the carrier and all persons engaged in performing his duty shall not be taken away by any reservation in his receipt, or by any arrangement between them and the performing company. . . . From an examination of the authorities on this subject, we conclude that a common carrier cannot, by special notice brought home to the knowledge of the owner of the goods, much less by general notice, nor by contract even, exonerate himself from the duty to exercise ordinary care and prudence in the transportation of goods; and we deduce from the principles enunciated by them the following propositions: (1) That a common carrier being an insurer

BAILEY *v.* WINSTON.

against all losses and damages, except those occurring from the act of God or the public enemy, may by special notice brought to the knowledge of the owner of goods delivered for transportation, or by contract, restrict his liability as an insurer, where there is no negligence on his part. (2) That he cannot by contract even limit his responsibility for loss or damage resulting from his want of the due exercise of ordinary care."

In Cyc., vol. 6, 391, the author says: "The attempt on the part of carriers to limit their liability as against their own negligence or that of their servants, has been particularly persistent where the contract of transportation is with reference to live stock, but such limitations have been uniformly held ineffectual."

In this case the jury has found as a fact that the stock of the plaintiff was injured by the negligence of the defendant, under instructions to which there is no exception, and I, therefore, concur in the opinion that the plaintiff is entitled to recover the damages he sustained, notwithstanding the valuation clause in the bill of lading.